## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DESIREE LEA SANCHEZ (POPP), | CASE NO. 1:13-cv-02479-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 6, 7,  9, 10, 11, |

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Desiree Sanchez for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff asserts that the ALJ erred in evaluating her physical residual functional capacity because she did not include any limitations for stooping. However, no objective evidence supports a limitation in stooping. The ALJ properly discounted Plaintiff's credibility regarding her symptoms on the ground that her medical records and extremely conservative course of treatment contradicted her claims. Regardless, two of the three occupations identified by the ALJ that Plaintiff could perform in the national economy never require stooping, so any error was harmless.

Plaintiff asserts that the ALJ erred in failing to assign limitations in her ability to interact with supervisors, adapt to changes and stress in the work environment, understand, remember, and carry out detailed instructions, and make judgments in the work settings. However, with the exception of her ability to interact with supervisors, Plaintiff does not develop this argument, and

it is therefore waived. Even if it was not, none of the jobs identified by the ALJ require more than occasional interaction with supervisors, involve repetitive, short-cycle work with little or no changes, do not require working effectively under stress, do not require making judgments, and are limited to simple, one and two step instructions. Consequently, any error in failing to assess additional limitations was harmless.

Plaintiff asserts that the ALJ erred in failing to find that she met a Listing. However, both Listings identified by Plaintiff require that she establish the "Paragraph B" criteria. Plaintiff asserts that she has done so by showing marked limitations in social functioning and concentration, persistence, and pace. However, the medical records cited by Plaintiff to show that she had a marked limitation in social functioning actually demonstrate that she was able to maintain many "close" friendships, was not socially isolated, and carried on romantic relationships. The medical records cited by Plaintiff to show that she had a marked limitation in concentration, persistence, and pace actually show that she could complete serial sevens, perform cognitive tasks, and had intact memory. Moreover, even if the ALJ had erred in evaluating the Paragraph B criteria, Plaintiff would not have been able to show that she met the "Paragraph A" criteria for either Listing. For all of the foregoing reasons, the Court affirms the decision of the Commissioner and denies Plaintiff's appeal.

## II.    Procedural Background

On January 10, 2011, Plaintiff filed an application for SSI under Title XVI of the Act and for DIB under Title II of the Act. (Tr. 176-88). On May 6, 2011, the Bureau of Disability Determination denied these applications (Tr. 85-104), and Plaintiff filed a request for a hearing on June 3, 2011.  (Tr. 119-20). On July 11, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 31-

84).  On July 23, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 11-25). On September 21, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 7-10), which the Appeals Council denied on August 13, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On September 30, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On December 3, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 6, 7). On January 6, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 9). On February 11, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 10). On February 20, 2014, Plaintiff filed a brief in reply. ("Pl. Reply"). (Doc. 11).  On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case for adjudication to the undersigned on June 9, 2014, and an order referring the case to the undersigned for adjudication was entered on June 9, 2014. (Doc. 14, 15).

### III.       Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than a preponderance. Jones, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate" to support a conclusion reached by the Commissioner, then the

Commissioner's determination is supported by substantial evidence. <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190 (3d Cir. 1986); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999); <u>Johnson</u>, 529 F.3d at 200.

## IV.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. <u>See</u> 20 C.F.R. § 404.1520; <u>see also</u> <u>Plummer</u>, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. <u>See</u> 20 C.F.R. § 404.1520.  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. <u>See</u> 20 C.F.R. §§ 404.1520,

416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

Plaintiff was born on January 16, 1983 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 35, 76).   She has a high school education and past relevant work as a nurse assistant. (Tr. 76).

### Mental Impairments

Plaintiff had a long history of depression and anxiety, but they were historically "well-maintained" by a combination of Zoloft and Depakote. (Tr. 281). Plaintiff lost her insurance early in 2008, and presented to Dr. Dwight Eichelberger, M.D., at Norlanco Family Associates for a recurrence of her depression symptoms on November 19, 2008. (Tr. 281). She had mild to moderate symptoms, but reported she had a "strong social support network" and would later indicate that her boyfriend was "very good to her" and a "good sounding board." (Tr. 280-81). She was restarted on Zoloft and Depakote, and continued her work as a certified nurse assistant ("CNA") thirty hours a week. (Tr. 210, 212, 281).

In August of 2009, Plaintiff reported worsening symptoms of depression and anxiety. (Tr. 259, 276). She had been taking Zoloft, but had "just restarted Depakote." (Tr. 259, 276). She had

a "number of psychosocial stressors" and her family physician could not "rule out inpatient treatment," but she continued working thirty hours a week as a CNA. (Tr. 210, 212, 269-60).

On January 3, 2010, Plaintiff stopped working when her only client died in her arms. (Tr. 361). On January 13, 2010, Plaintiff presented to the emergency room at Hershey Medical Center reporting that she was having a "bad mental break down." (Tr. 353). She had been off of her medications for about two months. (Tr. 370). She had significant symptoms, including occasional thoughts of suicide. (Tr. 353). However, she did not meet the requirements for involuntary hospitalization, and refused to consent to voluntary hospitalization because she needed to care for her children. (Tr. 353-54). She was discharged home and instructed to follow-up at Philhaven. (Tr. 354).

On January 18, 2010, Plaintiff presented to Philhaven for a psychiatric evaluation with Dr. Nhien Nguyen, M.D., and continued to exhibit significant symptoms. (Tr. 370). She reported that she generally had one panic attack per month, but had five panic attacks in the previous three weeks. (Tr. 370). She reported sleeping only three hours a night, using energy drinks to stay awake, and mood swings "as long as she could remember." (Tr. 370). She was assessed a GAF of 50. (Tr. 371). Dr. Nguyen started Plaintiff again on Depakote and Zoloft and also prescribed her Klonopin for anxiety and panic attacks. (Tr. 372).

After restarting her medications, Plaintiff improved. Plaintiff reported on February 8, 2010 that she had less depression and reported on March 8, 2010 that she had only "a little" anxiety and no panic attacks. (Tr. 383-84). On April 22, 2010, she reported that she had broken up with her boyfriend, but that her sleep and appetite were "ok." (Tr. 380). On July 14, 2010, Plaintiff reported an increase of symptoms, including sleeping only three to four hours at a time and having two panic attacks two weeks earlier. (Tr. 377). However, Plaintiff lost her

transportation, and did not follow-up at Philhaven again until after being hospitalized in December of 2010. (Tr. 314, 317, 375-77). She would have run out of her medication around October 14, 2010.[1]

On September 28, 2010, Plaintiff saw Dr. Lorin Beidler, M.D., at Norlanco Family Associates. (Tr. 256). She denied malaise/fatigue. (Tr. 256).

Plaintiff's alleged onset was October 3, 2010. (Tr. 16). Around December 7, 2010, Plaintiff was admitted to Lancaster General Hospital because she "had a nervous breakdown and she cut herself…on the upper portion of her wrist." (Tr. 316).[2] She wanted to leave and "put in for a 72 hour letter…and talked to her lawyer." (Tr. 316). On December 8, 2010, Plaintiff was discharged. (Tr. 345). However, once home, Plaintiff took fifteen Klonopin, so an ambulance brought her back to the emergency room, this time at Hershey Medical Center. (Tr. 316). On admission, Plaintiff said "I don't want to live anymore." (Tr. 349). Plaintiff "stated the reason was to kill herself." (Tr. 316, 352). Plaintiff's mother reported that Plaintiff took the Klonopin because her boyfriend broke up with her. (Tr. 345). Plaintiff initially consented to a voluntary hospitalization, but then refused treatment and became disruptive. (Tr. 351). She was uncooperative, refused to answer basic questions, and continued to refuse treatment, so she was involuntarily hospitalized. (Tr. 345).  Plaintiff's drug test was positive for marijuana. (Tr. 347).

Plaintiff was transferred to the Pennsylvania Psychiatric Institute and hospitalized there

---

[1] As of September 28, 2010, Plaintiff was still taking Depakote, Zoloft, and Klonopin. (Tr. 258). She had been given a ninety-day supply (thirty days with two refills) on July 14, 2010, so she would have run out around October 14, 2010. (Tr. 377). By the time of her admission to Lancaster General on December 7, 2010, she was taking only Klonopin, and was prescribed Buspar during her course there. (Tr. 316).

[2] The Court does not have records from Plaintiff's hospitalization at Lancaster General Hospital from December 7, 2010 to December 9, 2010. It appears the state agency requested records from November of 2010 instead of December of 2010. (Tr. 366, 369). However, Plaintiff described this visit to providers at Pennsylvania Psychiatric Institute. (Tr. 316).

from December 9, 2010 to December 13, 2010. (Tr. 316). Contrary to her earlier reports, she stated that she was not trying to harm herself when she took the Klonopin, she was just overwhelmed with fifteen people calling her home and asking about her and  was just trying to sleep. (Tr. 316). Plaintiff "stated that she has been feeling depressed from time to time, but this varies from 1 day to another, and she would deny that her mood is constantly depressed for the last couple weeks or so. She stated usually she is sad for a day or 2 and then she feels good." (Tr. 316). She reported problems with eating, appetite, sleeping, short term memory, concentration and energy level. (Tr. 316). She indicated that "anxiety is a big problem for her, and she rated anxiety 8/10 today...at times the anxiety gets so bad that she gets palpitations, short of breath, and she feels like she is going to die and that happens usually once or twice a week." (Tr. 316).

Plaintiff reported a long history of abuse and described "chronic feelings of emptiness, scared that she is going to be abandoned and being impulsive and feeling scared and then having difficulties regulating her affect and moods, feeling irritable and angry at times." (Tr. 317). She reported that she had last used marijuana one week earlier. (Tr. 317). Plaintiff also reported that she had not been able to attend outpatient therapy since June because her car was "not in good shape." (Tr. 317). When Plaintiff's mother was contacted, she "also discussed her difficulty attending outpatient mental health appointments due to lack of transportation." (Tr. 314). Plaintiff became visibly upset, tearful and very irritable when she realized that procedures were different for involuntary hospitalizations and was tearful and very irritable. (Tr. 318). Insight, judgment, impulse control, coping skills, and her way of responding to situations were poor, and she walked out of the interview. (Tr. 318). She was assessed a GAF of 40. (Tr. 318).

However, Plaintiff was "much brighter" after 24 hours of admission and "actively engaged in most of the activities with peers and in the groups." (Tr. 314). Plaintiff was

discharged on December 13, 2010 when she "presented calm, cooperative, and talked about her recovery. She felt that the current medication regimen suited her well." (Tr. 314). She reported improved energy and motivation. (Tr. 313). Her diagnoses at the time of discharge included depressive disorder, not otherwise specified, panic disorder without agoraphobia, cannabis abuse, and borderline personality disorder. (Tr. 313). She was assessed a GAF of 50. (Tr. 313).[3]

On December 28, 2010, Plaintiff presented to the emergency room at Hershey Medical Center with a probable panic attack. (Tr. 340). She was cooperative with "appropriate mood and affect." (Tr. 342). She was treated with oxygen and discharged home. (Tr. 340, 342).

After Plaintiff's inpatient hospitalization, she was treated twice at Philhaven, once on December 21, 2010, and once on March 7, 2011. (Tr. 373-74). In December, she reported that she had been doing "ok" since her discharge and had "increased energy." (Tr. 374). In March, she reported that she was more depressed, and notes indicate that she was observed to be "drowsy" and "not sure if completely compliant [with] meds." (Tr. 373). However, there are no subsequent records from Philhaven after this visit.[4]

On April 15, 2011, state agency physician Dr. John Tardibuono, Ed.D, performed a consultative examination. (Tr. 388). Plaintiff was verbal and alert with a somewhat sad, depressed mood and anxious affect. (Tr. 388). Her speech was normal, but she cried openly a few times during the session. (Tr. 388). She reported engaging in self-harm as recently as the last week. (Tr. 390). Plaintiff indicated that she had poor sleep with nightmares, appetite, and eating habits, impulse control, and volatile temper, but denied hallucinations and delusions. (Tr. 390).

---

[3] Plaintiff was assessed a GAF of 51 to 60 by a resident in an initial discharge summary, but an addendum to the discharge summary by Plaintiff's admitting physician amended the GAF to 50 and added additional diagnoses. (Tr. 313, 315).

[4] Plaintiff testified that she saw a counselor at Philhaven twice a week for almost a year, ending in about March of 2012, but Philhaven represented that her counselor was only an intern, and that they no longer had those records. (Tr. 26).

However, Plaintiff denied specific acting out or aggression towards people. (Tr. 390). Plaintiff reported that she "has for the most part been clean and sober for the past year and a half." (Tr. 391). On mental status exam, Plaintiff's "long-term and recent memory is acceptable, but she does have problems with short-term memory requiring that she write everything down." (Tr. 391). Her thinking was "direct, rational, logical, and goal directed," she "responded to similarities at very adequate levels of abstraction," and was "able to complete both simple mental math and serial 7's." (Tr. 391).

Dr. Tardibuono opined that Plaintiff had a "long history of mental, emotional, and behavioral difficulties with considerable instability related to suicide ideation and/or attempts." (Tr. 392). He also opined that Plaintiff had "issues related to poor social judgment, impulsive and somewhat aggressive behaviors with quick anger and agitation." (Tr. 392). Dr. Tardibuono opined that Plaintiff is "capable of understanding and remembering simple instructions" and is "capable of completing simple repetitive" tasks but "may have some difficulty with focus due to mood transitions." (Tr. 392). Dr. Tardibuono noted that while Plaintiff "did not reference specific conflicts with fellow workers or supervisors during prior work history, she does express issues related to poor social judgment, impulsive and somewhat aggressive behaviors with quick anger and agitation." (Tr. 392). He concluded that "she very likely would have significant conflicts with fellow workers and/or supervisors." (Tr. 392). Dr. Tardibuono assessed her to have bipolar disorder, not otherwise specified, anxiety disorder with panic, and posttraumatic stress disorder, with a GAF of 48. (Tr. 391).

Despite Dr. Tardibuono's observations and Plaintiff's reports, he concluded that she could perform at least satisfactorily in all work functions. (Tr. 394-95). He opined that she had only slight limitations in her ability to understand and remember detailed instructions, make

judgments on simple work-related decision, interact appropriately with the public and coworkers, and respond appropriately to changes in a routine work setting. (Tr. 395). He opined that she had only slight to moderate limitations in her ability to carry out detailed instructions and interact appropriately with supervisors. (Tr. 395).  He opined that she had only moderate limitations in her ability to respond appropriately to work pressures in a usual work setting. (Tr. 395). Slight limitations were defined on the form as "some mild limitation in the area, but the individual can generally function well," and moderate limitations were defined as "moderate limitation in the area, but the individual is still able to function satisfactorily." (Tr. 394).

On May 4, 2011, a state agency physician, Dr. Karen Weitzner, Ph.D, reviewed Plaintiff's file and completed a Listings analysis. (Tr. 88). She opined that Plaintiff had mild limitations in her activities of daily living, moderate limitations in social functioning and concentration, persistence, or pace, and one or two episodes of decompensation. (Tr. 89). In the mental RFC assessment, she opined that Plaintiff has moderate limitations in her ability to maintain attention and concentration for extended periods, carry out detailed instructions, interact appropriately with the general public, accept instruction and criticism appropriately from supervisors, and respond appropriately to changes in the work setting. (Tr. 90-91).

Dr. Weitzner explained:

Claimant's cognitive functioning is intact. She is limited in her ability to sustain concentration. She is able to complete simple, routine tasks. Claimant is easily frustrated and she reports she has acted out both verbally and physically in the past. She would work best independently. Claimant's allegations are partially credible. The medical source opinion provided by John Tardibuono, Ed.D, is consistent with the current assessment and is given great weight. Claimant is capable of sustained employment despite the limitations related to her mental health impairment.

(Tr. 91).  On May 6, 2011, Dr. Jonathan Rightmyer, Ph.D. reviewed Plaintiff's file. A suicide hold had been placed on Plaintiff's file, and he indicated that her suicide potential was "low,

cannot rule out." (Tr. 403). However, he "agree[d] with denial decision." (Tr. 403).

There is no evidence of any mental health treatment from any provider until November 29, 2011, when Plaintiff presented to her family doctor at Norlanco for depression. (Tr. 468). She was not nervous/anxious and does not have insomnia." (Tr. 468). She had a "normal mood and affect." (Tr. 468). She had been off of her medications since June, and was again restarted on Zoloft, Depakote, and Klonopin. (Tr. 468). There is no evidence of any additional mental health treatment. Instead, while being treated for bronchitis and musculoskeletal pain throughout 2012, Plaintiff had "normal mood and affect." (Tr. 479, 486, 492). On March 13, 2012, Plaintiff had normal mood, affect, behavior, judgment, and thought content. (Tr. 497). On March 30, 2012, Plaintiff was "negative for depression, hallucinations, memory loss and substance abuse" and was "not nervous/anxious" with "normal mood and affect." (Tr. 504-05). On April 13, 2012, Plaintiff's "underlying bipolar [was] well managed." (Tr. 511). She was "negative for depression, hallucinations, memory loss and substance abuse" and was "not nervous/anxious and does not have insomnia." (Tr. 511). Dr. Yoder noted "mood stable." (Tr. 512).

## Physical Impairments

Plaintiff first complained of back pain on December 3, 2009. (Tr. 273). She had "never had trouble with her back before." (Tr. 273). She reported severe back pain that radiated down her leg, and she went to the emergency room at Hershey Medical Center. (Tr. 273). She had an MRI, but it was mostly normal, with only minimum abnormalities. (Tr. 251). Specifically, an MRI of Plaintiff's thoracic spine was "within normal limits." (Tr. 251). An MRI of Plaintiff's lumbar spine indicated "minimal degenerative changes of the lumbar spine with mild circumferential disc bulge and mild bilateral neuroforaminal narrowing" but the "remainder of the spine is unremarkable." (Tr. 251). Plaintiff was treated with Valium, Percocet, and ibuprofen.

(Tr. 273). The next day, she followed-up at Norlanco Family Medicine. (Tr. 273). She had a positive straight leg raise and "some" muscle spasms. (Tr. 273). However, her reflexes were present and her strength was good. (Tr. 273). She was being treated with Percocet, Valium, and ibuprofen, but Percocet made her nauseous. (Tr. 273).

At a follow-up on December 23, 2009, Plaintiff indicated that her pain was moderate, worse with walking, lifting, prolonged sitting and standing. (Tr. 270). She had discomfort with left straight-leg raising. (Tr. 270). She had "decreased but present reflexes in both Achilles and patellar areas and normal gait and station." (Tr. 270). She had "no foot drop at this time although left EHL is not as strong as the right, 4 out of 5 as compared to 5 out of 5." (Tr. 270).

However, by April of 2010, Plaintiff was no longer taking Percocet or Valium. She had reported on March 9, 2010 at Philhaven that she had joined a gym and was going three times per week.  (Tr. 383). On April 16, 2010, Plaintiff saw Dr. Jonathan Stewart, M.D., at Norlanco Family Medicine. (Tr. 263). She was complaining of left foot pain, "she felt like she bruised it walking around at Hershey Park." (Tr. 263). Imaging revealed no fracture, and she "declined stronger pain medications." (Tr. 263). Interestingly, Plaintiff would report on April 22, 2010 to Dr. Nguyen at Philhaven that she "broke" her foot two weeks earlier after "excessive walking and running ten miles on treadmill." (Tr. 380).  When Plaintiff presented to Norlanco Family Associates on September 28,  2010, complaining of a lump in her neck, her only medications were Klonopin, Depakote, Zoloft, and Albutrol, which, as discussed below, are used to treat anxiety, depression, and asthma, not back pain. (Tr. 256-57).

Plaintiff's alleged onset date is October 3, 2010. (Tr. 16).  During Plaintiff's inpatient hospitalization at the Pennsylvania Psychiatric Institute, she complained of back pain. (Tr. 325). On evaluation, her reflexes were intact and she had 5/5 muscle strength in her lower extremity,

although she stated that it was painful when her strength was evaluated. (Tr. 325). She had "mild pain on deep palpation of her lower lumbar spine." (Tr. 325). Her gait was "slow, but stable" with "slightly decreased weightbearing on her right lower extremity." (Tr. 325). Because Plaintiff's muscle strength was normal and examination revealed on minimal abnormalities, Plaintiff did not need acute intervention or narcotics, and would be treated only with anti-inflammatories. (Tr. 326).  On December 28, 2010, she reported back pain during her emergency room visit, but her back was nontender and there was no swelling. (Tr. 341).  Plaintiff was not taking any pain medications. (Tr. 341). Although Plaintiff was subsequently treated with ibuprofen for groin pain, her groin pain resolved after a hysterectomy in October of 2011, and she was never treated for back or muscle pain during 2011. (Tr. 430, 439, 447, 457, 462, 466, 471, 480, 487, 491). She did not mention back or muscle pain again until fifteen months later, in March of 2012. As late as March 5, 2012, Plaintiff specifically denied myalgia, or "[p]ain in a muscle or in several muscles." 4-M Attorneys' Dictionary of Medicine M-77403. (Tr. 492-93).

On March 13, 2012, Plaintiff was seen at Norlanco Family Medicine for leg pain, fatigue, and headache. (Tr. 497). She could not "recall any cause just began having pain bilateral calves on Sunday afternoon…never occurred before." (Tr. 497). She was checked for Lyme disease, but the test was negative. (Tr. 497, 522). She was prescribed Flexeril, 10mg, three times a day, for ten days. (Tr. 497).

On March 30, 2012, Plaintiff was seen at Norlanco Family Medicine. (Tr. 500). She reported that she had fatigue, dizziness, and pain in hips, knees, wrists, and fingers, that had been getting worse over the previous two months. (Tr. 500). She had soft tissue swelling, myalgias, back pain, joint pain, weakness, and headaches. (Tr. 504). Dr. John Yoder, M.D., opined that "this will likely be fibromyalgia, rule out and work up then begin to treat, concentrating on

improving sleep and fatigue." (Tr. 505). She was no longer taking Flexeril. (Tr. 505).

On April 13, 2012, Plaintiff followed-up with Dr. Yoder. (Tr. 511). She continued to report fatigue, poor sleep due to pain, bilateral pain in her back and neck, but no numbness or weakness. (Tr. 511). Plaintiff was restarted on Flexeril for sixty days, but her dose was decreased to 10 mg, once per day at bedtime. (Tr. 512). There are no subsequent medical records.

### Function Reports, Testimony, and ALJ Findings

When Plaintiff was completing her claim over the telephone on January 10, 2011, the interviewer indicated no problems with understanding, coherency, or concentrating. (Tr. 199). On February 2, 2011, Plaintiff's mother, Cindy Krut, completed a Third Party Function Report. (Tr. 221). She reported that Plaintiff cooks and provides general daily care for her three children and cares for pets. (Tr. 222). She reported that Plaintiff can cook "whatever she wants" and cooks on a daily basis. (Tr. 223). She reported that Plaintiff does not "finish what she starts."(Tr. 223, 226). She also indicated that Plaintiff needed help following through with appointments, paperwork, paying bills, and cleaning. (Tr. 223). She reported that Plaintiff "quite often" is too depressed to get out of bed, but that she goes outside daily. (Tr. 224). She indicated that Plaintiff can walk, drive, and ride in a car and is able to go out alone. (Tr. 224). She reported that Plaintiff shops in stores for groceries weekly. (Tr. 224). She reported that Plaintiff reads, watches television, and listens to music, but has a hard time concentrating and focusing. (Tr. 225). She reported that Plaintiff spends time with others in person and over the phone on a daily basis. (Tr. 225). She reported that Plaintiff has a hard time getting along with others because she "has little or no tolerance for constructive criticism or advice."(Tr. 226). She indicated that Plaintiff's ability to get along with authority figures "varies according to her mood swings. She can be very combative at times." (Tr. 227). She reported that Plaintiff "doesn't handle stress at all" and had

been fired from a job because of problems getting along with other people. (Tr. 227). She reported that Plaintiff's impairments impact her ability to lift, squat, bend, stand, walk, and get along with others. (Tr. 226). She reported that Plaintiff does not use a cane. (Tr. 227).

On June 29, 2011, Plaintiff completed a Disability Report-Appeal. (Tr. 239). She reported that her anxiety has "increased significantly" and her depression "has become out of control." (Tr. 239). She reported that she "had to move in a roommate to help with daily tasks, cleaning, cooking, etc." (Tr. 239). She reported that she was not motivated to care for herself, forgets to eat, and needs to be reminded to shave. (Tr. 243). She reported that she no longer goes out with friends, she "pretty much sleeps" until her children come home from school, "gets them taken care of" and then goes back to bed. (Tr. 244).

On July 11, 2012, Plaintiff appeared and testified at the ALJ hearing. (Tr. 33). Plaintiff testified that she lives alone with her three children, twins, age 11, and a younger son, age 8. (Tr. 36). Plaintiff explained that her post-traumatic stress disorder stemmed from being sexually abused as a child by her father, being in an abusive marriage for four years, being raped, and having a patient die in her arms while she was working as a CNA. (Tr. 39-40). Plaintiff testified that she was slightly dyslexic, but she can read, write, and understand the English language. (Tr. 40). Plaintiff admitted that she babysat for her neighbor three hours a day, Monday through Thursday, off and on for about two years. (Tr. 42-43).

Plaintiff testified that she first used marijuana when she was eight years old, and had last used it in October of 2011. (Tr. 33). She testified that she quit from the time that she was seventeen years old until March of 2011. (Tr. 44).

Plaintiff testified:

I have severe anxiety. I have a hard time going places where there's crowds of people. I have a hard time dealing with my kids at their sporting events. I can't concentrate. I have

a really hard time remembering things. I find myself depressed and sitting in the bathroom or sitting in my room, crying my eyes out for hours at a time, and I don't know why.

(Tr. 48). She testified that her crying spells occurred two or three times a week and last anywhere from five minutes to an hour. (Tr. 67). Plaintiff testified that she had suicidal thoughts every other month, and began to cry as she testified that she has panic attacks anytime she leaves her house. (Tr. 66). She testified that she had panic attacks four or five times per week that last from five minutes to an hour, and that she had a panic attack in the car on her way to the hearing. (Tr. 67). She also testified "I have extreme mood swings" that occur daily, where she will get angry and "snap at the drop of the a dime" and other times is "just this happy-go-lucky person that's running around like a chicken with her head cut off…very manic." (Tr. 72). She testified that she had no energy or motivation, had lost weight, and only slept two to three hours per night with severe nightmares. (Tr. 64-65). Plaintiff testified that her medications made her "constantly tired," nauseous, shaky, and made it difficult for her to remember things. (Tr. 64).

She also testified "I don't deal well with authority. I've gotten into lots of trouble because of it at work." (Tr. 61). She described several problems with authority figures at her previous jobs, but admitted that she had been able to continue working at McGuire Memorial, her most recent job, when she was transferred to in-home care and had less contact with supervisors. (Tr. 61-63). Plaintiff testified that she had two or three friends, and that her neighbor and his wife help her get groceries. (Tr. 68). Plaintiff admitted that she was able to participate in group counseling for about four months, from February to June of 2012. (Tr. 47).

Plaintiff testified that she had received physical therapy for a month and a half for her back problems, but had to stop because she did not have transportation. (Tr. 53). She testified that she is treated only with Effexor and Flexeril for her fibromyalgia. (Tr. 51). She testified to

problems with lifting, sitting, walking, getting in and out of bed, and doing her chores. (Tr. 54-55). However, she admitted that she occasionally cooks full meals with help from her children, neighbor, and boyfriend. (Tr. 65). Plaintiff testified that she can walk about two blocks at a time and uses a cane to ambulate about two weeks out of a month. (Tr. 69). She testified that the muscles in her arms "constantly feel like they're flexed" and that her fingers "lock up." (Tr. 70).

A VE also appeared and testified. (Tr. 74). The VE testified that, given the ALJ's RFC as described below, Plaintiff could not perform any past relevant work. (Tr. 80). However, he testified that Plaintiff could perform work as a cleaner, housekeeper - - DOT 323.687-014, a press hand - - DOT 583.687-010, and an assembler, small products II - - DOT 739.687-030. (Tr. 81). Plaintiff's attorney asked the ALJ, "I don't think you included any interaction with the supervisors-- that was not discussed, correct?" (Tr. 82). The ALJ replied "If you want to make supervisors different than coworkers, you may. I basically said coworkers occasionally." (Tr. 82). Plaintiff's attorney then asked the VE whether any jobs would exist if Plaintiff could not have any interaction with coworkers and supervisors at all, and the VE testified "that would exclude those occupations I identified." (Tr. 82). The VE also testified that if Plaintiff would be off task more than twenty percent a day due to cognitive impairments from medication or anxiety attacks, or would be absent more than four days per month, there would be no work Plaintiff could perform. (Tr. 83).

On July 23, 2012, the ALJ issued her decision. (Tr. 25). At step one, the ALJ found that Plaintiff was insured through December 31, 2010 and had not engaged in substantial gainful activity since October 3, 2010, the alleged onset date. (Tr. 16). At step two, the ALJ found that Plaintiff's drug abuse, depression, anxiety, bipolar disorder, panic disorder, posttraumatic stress disorder, fibromyalgia, degenerative disc disease of the lumbar spine, myositis, and migraines

were severe. (Tr. 16). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 17). The ALJ found that Plaintiff had the RFC to perform less than the full range of light work with two unscheduled five minute breaks, limited to occasionally using hand/arm levers or cranks bilaterally, foot and leg pedals or levers bilaterally, climbing stairs, crouching, squatting, kneeling, and crawling on hands or knees or feet. (Tr. 19). Plaintiff was precluded from climbing any rope, ladder, scaffolding, or pole, noise intensity levels of loud and very loud, working in high exposed places, around fast moving machinery on the ground, around or with sharp objects, and around or with toxic or caustic chemicals. (Tr. 19). Plaintiff was limited to only occasionally interacting with coworkers and avoiding altogether direct interaction with the public. (Tr. 19). At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. 23). However, at step five, the ALJ found that Plaintiff could perform other work in the national economy in positions like a housekeeper, a press hand, and an assembler. (Tr. 23-24).

## VI.   Plaintiff Allegations of Error

### A.  Failing to include additional physical limitations in the RFC

Plaintiff asserts that the ALJ's physical RFC assessment is flawed because she failed to "address any limitation with regard to bending." (Pl. Brief at 7). Plaintiff continues, "[t]he ALJ failed to explain why she assigned limitations for all other postural activities except for bending, which can certainly be inferred would be affected by [Plaintiff's] fibromyalgia, degenerative disc disease of the lumbar spine, and myositis." (Pl. Brief at 7). Defendant responds that the ALJ accounted for limitations in bending by assessing limitations in climbing, balancing, kneeling, crouching, and crawling. (Def. Brief at 17-18).  Defendant correctly cites Social Security Rulings to note that:

> Postural limitations or restrictions include activities such as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching or crawling. Social Security Ruling (SSR) 96-

9p, at * 7. Furthermore, "[s]tooping, kneeling, crouching, and crawling are progressively more strenuous forms of bending parts of the body, with crawling as a form of locomotion involving bending." SSR 85-15, at * 7. Stooping involves "bending the body downward and forward by bending the spine at the waist," crouching involves "bending the body downward and forward by bending both the legs and spine," and kneeling involves "bending the legs at the knees to come to rest on one or both knees." Id.

(Id.). However, Plaintiff responds that the ALJ did not include any limitations for stooping, so the RFC is inadequate. (Pl. Reply at 1-2).

Plaintiff is correct that the ALJ did not include any limitations for stooping. However, the ALJ properly rejected Plaintiff's claimed symptoms related to her back pain. When making an RFC assessment, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P. Conservative medical treatment can undermine a claimant's credibility. SSR 96-7P. ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints."). Also, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7P.

Here, the ALJ found that the underlying medically determinable physical and mental impairments could reasonably be expected to produce the individual's pain or other symptoms. (Tr. 21). However, the objective medical evidence did not substantiate Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms. The ALJ noted that, prior to Plaintiff's onset date, she had positive straight leg raise test, "some" muscle spasms, and

decreased reflexes, but that these symptoms had not continued. (Tr. 21). None of these findings were present during the relevant period. The ALJ cited to Plaintiff's MRI, which indicated only minimal abnormalities, and the fact that she had no focal motor or sensory deficits during the relevant period. (Tr. 21, 436, 492-93).

The ALJ proceeded to make a credibility assessment, and properly discounted Plaintiff's credibility on the grounds that she had received only conservative treatment and her statements were inconsistent. (Tr. 22).  Aside from a short course of Valium and Percocet in December of 2009, Plaintiff did not receive any treatment prior to the relevant period. (Tr. 270, 273). Specifically, when she reported that she had bruised her foot in April of 2010 after "walking around in Hershey Park," she was taking only over-the-counter ibuprofen for her foot pain. (Tr. 263). She "decline[d] stronger pain medications." (Tr. 263). As of September 28, 2010, Plaintiff's medications included only Klonopin, Depakote, and Zoloft, all of which were prescribed for her mental impairments,[5] and Albutrol, which is used to treat asthma, 1-A Attorneys' Dictionary of Medicine A-4200.

During the relevant period, Plaintiff complained of back pain during her hospitalization in December of 2010 for her Klonopin overdose. (Tr. 325-26). However, she was not treated with any acute intervention or narcotics, only anti-inflammatories, because her abnormalities on exam were "minimal." (Tr. 325-26). At her emergency room visit on December 28, 2010, her medications included only Abilify, Buspar, Klonopin, and Paxil, which were all prescribed to

---

[5] Depakote is "[t]he trademark name of a medicine used in the treatment of absence seizures (clouding of consciousness)."  2-D Attorneys' Dictionary of Medicine D-33059. Zoloft is "The tradename of a medicine containing sertraline hydrochloride, used to relieve mental depression." 6-Z Attorneys' Dictionary of Medicine Z-125814.

treat her mental impairments. (Tr. 341).[6] Plaintiff was treated with ibuprofen for groin pain beginning in June of 2011, (Tr. 439, 457, 462), but the groin pain resolved after her hysterectomy on in October of 2011. (Tr. 430). Throughout 2011, Plaintiff's only other medications were varying courses of Abulterol, Zoloft, Depakote, and Klonopin. (Tr. 447, 466). Through March 5, 2012, the only other additional medications taken by Plaintiff were prednisone for her asthma and zithromax, Flovent and Bactrim for her bronchitis.  (Tr. 471, 480, 491). On March 13, 2012, Plaintiff was prescribed Flexeril 10mg, three times a day, for ten days, for her fibromyalgia and back pain. (Tr. 495). On March 30, 2012, Plaintiff was no longer taking Flexeril. (Tr. 501, 505). On April 13, 2012, Plaintiff was again prescribed Flexeril, 10mg, only one time per day, for sixty days. (Tr. 509). In sum, the records show that, during the relevant period, Plaintiff was treated for her musculoskeletal pain and fibromyalgia only with anti-inflammatories during her four day hospitalization in December of 2010. She did not receive any treatment for her musculoskeletal pain or fibromyalgia whatsoever for another fifteen months, until March 13, 2012, when she was prescribed ten days of Flexeril. At the time of the hearing, she had again been prescribed Flexeril, but only once per day at bedtime. This is very conservative treatment that significantly undermines her credibility.

Multiple other inconsistencies exist in the record. For instance, Plaintiff testified that she had stopped smoking marijuana at age seventeen, and did not start again until March of 2011, when she consumed marijuana until October of 2011. (Tr. 33, 44). However, Plaintiff reported in

---

[6] Abilify is "[t]he trademark name of an atypical neuroleptic used as an antipsychotic," 1-A Attorneys' Dictionary of Medicine A-382. Buspar is "[t]he trademark name of a medicine used to relieve anxiety," 1-B Attorneys' Dictionary of Medicine B-18682. Klonopin is "[t]he trademark name of a medicine used to treat epileptic seizures." 3-K Attorneys' Dictionary of Medicine K-64916. Paxil is "[t]he brand name of a preparation containing paroxetine hydrochloride," which is "[a] drug used as an antidepressant." 4-P Attorneys' Dictionary of Medicine P-87806; 4-P Attorneys' Dictionary of Medicine P-88326.

December of 2010 that she had been consuming marijuana, and her drug test was presumptively positive for marijuana. (Tr. 317, 347). In contrast, four months later, she reported that she had been sober for "a year and a half" during her consultative exam. (Tr. 391). Similarly, she denied marijuana use throughout the period between March and October of 2011. (Tr. 446, 452, 459). Plaintiff also provided different explanations for her Klonopin overdose in December of 2010. (Tr. 316, 347). Upon first arriving in the emergency room, she admitted that she had taken them with the intent to commit suicide, and her mother explained that she took them because her boyfriend had broken up with her. (Tr. 345, 352). However, once Plaintiff realized she was going to be involuntarily committed, she stated that she took the sleeping pills because she wanted to "calm down" after fifteen friends called her to ask how she was. (Tr. 316). As another example, Plaintiff told providers at Norlanco that she injured her foot while "walking around Hershey Park." (Tr. 263). She was informed that she did not break her foot. (Tr. 263). Six days later, she told her psychiatrist that she did break her foot, and that it occurred while running or walking ten miles on a treadmill. (Tr. 380).

Even if the ALJ had erred in failing to assess an additional limitation of stooping, such error would have been harmless. Two of the three occupations identified by the VE and the ALJ do not require stooping. The Dictionary of Occupational Titles for the press hand and assembler positions state "Stooping: Not Present - Activity or condition does not exist." (DICOT 583.687-010, 739.687-030). Further:

> [A] number of other courts have found harmless error where an alleged limitation that was not included in the ALJ's hypothetical (or in the RFC) was not necessary to perform one or more of the jobs identified by the VE, according to the DOT. *E.g. Caldwell v. Barnhart,* 261 F. App'x 188, 190 (11th Cir.2008) (environmental exposure); *Powell v. Astrue,* CIV. SKG 10–02677, 2013 WL 3776948, at *9 (D.Md. July 17, 2013) (collecting Fourth Circuit district court cases). However, other courts have refused to find harmless error in certain circumstances, such as when numerous components factor into each occupation under the DOT. *E.g. Greenwood v. Barnhart,* 433 F.Supp.2d 915, 928

(N.D.Ill.2006) (observing "the reality that occupational availability is the VE's expertise and not the Court's.")

Rochek v. Colvin, 2:12–CV–01307, 2013 WL 4648340 at *12 (W.D.Pa. Aug.23, 2013); see also

Rutherford v. Barnhart, 399 F.3d 546, 552-53 (3d Cir. 2005).

Plaintiff further asserts that she "testified that she uses a cane to ambulate, yet the ALJ failed to address any cane use in her RFC." (Pl. Brief at 7). Defendant responds that Plaintiff did not "require" the use of a cane to ambulate, so an additional restriction based on her use of a cane was unnecessary. (Def. Brief at 18). Defendant explains that:

> The ALJ noted that Sanchez testified that she used a cane to ambulate at times, but that the cane was not prescribed by a physician (Tr. 20, 22, 69). The ALJ also discussed the MRI of the lumbar spine which indicated that Sanchez had only minimal degenerative changes with mild circumferential disc bulge and mild bilateral foraminal narrowing (Tr. 21, 251). The ALJ also noted that in May 2010, Sanchez reported that she had been doing extreme walking and running 20 miles on a treadmill (Tr. 21, 380) (Tr. 21). The ALJ also referred to the evidence which showed that Sanchez had a normal gait and station (Tr. 21, 270, 318, 322, 324).

(Def. Brief at 18-19).

An ALJ must find that an assistive device to ambulate be medically-required in order to include it as an exertional limitation. SSR 96-9p. Specifically:

> Medically required hand-held assistive device: To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

SSR 96-9p. Plaintiff has not identified any medical documentation "establishing the need for a hand-held assistive device." The ALJ properly noted that Plaintiff had a normal gait and station without using a cane. (Tr. 21).  Plaintiff's mother reported that Plaintiff does not use a cane. (Tr. 227). Thus, substantial evidence supports the ALJ's decision not to include Plaintiff's alleged use of a cane in the RFC assessment.

**B.      Failure to assign significant weight to the consulting physician opinion**

Plaintiff asserts that the ALJ should have given Dr. Tardibuono's opinion significant weight, and that her rationale for discounting his opinion was nonspecific, boilerplate language. The Court agrees. The ALJ generically wrote that she gave "limited weight to the opinions of John Tardibuono, D.Ed., because they are not consistent with the evidence of record, including treating source records, and the claimant's longitudinal clinical examination findings." (Tr. 22). The ALJ did not provide further explanation or any citations to the record. (Tr. 22).  This violates an ALJ's duty to provide specific, clear reasons for rejecting medical opinion evidence. Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986). Moreover, the non-examining state agency physician, who has medical training, concluded that Dr. Tardibuono's opinion was consistent with the medical evidence. (Tr. 89, 91). "[A]n ALJ is not free to set his [or her] own expertise against that of a physician who presents competent evidence." Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985). An ALJ impermissibly substitutes her "own judgment for that of a physician" when she independently reviews and interprets the objective medical evidence. Id. The ALJ, who does not have medical training, reviewed the same file, and concluded that Dr. Tardibuono's opinion was not consistent with the medical evidence. (Tr. 22). This constitutes an substitution of her own judgment for that of a physician and impermissible reinterpretation of objective medical evidence.

However, Dr. Tardibuono did not opine that Plaintiff could not work. Plaintiff correctly points out the Dr. Tardibuono observed that Plaintiff may have "some difficulty with focus due to mood transitions," "very likely would have significant conflicts with fellow workers and/or supervisors," and exhibited other symptoms. (Pl. Brief at 9-10) (citing Tr.at 391-392)). However, despite these observations, Dr. Tardibuono opined that Plaintiff could perform at least

satisfactorily in all work functions assessed by the mental RFC analysis.[7] (Tr. 395). Thus, while Plaintiff has some additional limitations in certain areas, she was not precluded from any job function, including interacting with supervisors. As discussed more fully below, the ALJ's failure to assign the limitations identified by Dr. Tardibuono was harmless because the jobs identified by the VE accommodated for the slight or moderate limitations identified by Dr. Tardibuono. The Court will therefore not remand based on the ALJ's failure to provide sufficiently specific justification to reject Dr. Tardibuono's opinion because it would not change the outcome of the decision.   Rutherford v. Barnhart, 399 F.3d 546, 552-53 (3d Cir. 2005) (remand is not required when it would not affect the outcome of the case).

## C.      Failing to include additional mental limitations

With regard to her mental impairments, Plaintiff asserts that the ALJ's RFC assessment is flawed because she "failed to address any limitation with regard to [Plaintiff's] ability to interact appropriately with supervisors." (Pl. Brief at 7). Plaintiff also asserts the ALJ should have included Dr. Weitzner's opinion that Plaintiff was ""limited in her ability to handle work demands and changes." (Pl. Brief at 8). However, aside from the opinion evidence, the evidence cited by Plaintiff does not contradict the ALJ's RFC assessment. Plaintiff cites to the record at Tr. 312-26, which contains Plaintiff's December 2010 inpatient hospitalization at Pennsylvania Psychiatric Institute, and the record at Tr. 403-04, which was Dr. Rightmeyer's assessment that Plaintiff's suicide potential was low, but that "agree[d] with denial decision." (Pl. Brief at 8). However, Plaintiff does not explain how these records support her argument that the ALJ should have assessed additional mental limitations. Dr. Rightmeyer's assessment indicates only that

---

[7] At most, Dr. Tardibuono assigned Plaintiff "moderate" limitations in a few areas, but moderate limitations are defined as "moderate limitation in the area, but the individual is still able to function satisfactorily." (Tr. 394).

Plaintiff's suicide risk is low, but that he agrees with the denial of benefits decision. (Tr. 403-04). The ALJ acknowledged Plaintiff's December 2010 inpatient hospitalization, but noted that it was an isolated incident, explaining that her need for intensive treatment was neither "ongoing" nor "persistent." (Tr. 21).  Moreover, at the time of Plaintiff's hospitalization, she had stopped taking Depakote or Zoloft. Once Plaintiff was restarted on her medications on March 7, 2011, she did not need treatment after that through July 23, 2012, the ALJ decision date, except for November 29, 2011, when her medications were again restarted. (Tr. 468). Similarly, Plaintiff cites GAF scores of 31 to 60, but does not challenge the ALJ's assignment of little weight to the GAF scores on the ground that they apply only to a particular point in time and have limited probative value to Plaintiff's overall longitudinal functioning. (Pl. Brief at 8) (Tr. 23).

With regard to the opinion evidence, both physicians opined that Plaintiff had moderate limitations in interacting with supervisors. However, each of the positions the ALJ found Plaintiff could perform has a "People" value of "8-Taking Instructions-Helping-Not Significant." DICOT 323.687-014; DICOT 583.687-010; DOT 739.687-030. Many Courts have held that a position with this "people" code is one that can be performed despite limitations in interacting with supervisors:

> [T]he descriptions of both loader of semi-conductor dies and touch-up screener do not mention dealing with people and identify the presence of taking instructions from and helping people in a "Not Significant" amount. *Id.* §§ 726.684–110, 726.687–030. Thus, inclusion of a limitation to occasional, brief, and superficial contact with coworkers and supervisors in the administrative law judge's hypothetical question would not have excluded two of the three jobs on which the administrative law judge relied, and any error in omitting that limitation from the question and from the RFC can only have been harmless.[6] *See, e.g., Larsen v. Astrue,* No. 1:10–CV–00936–JLT, 2011 WL 3359676, at * 15 (E.D.Cal. Aug. 3, 2011) (jobs with "not significant" level of interaction in DOT appropriate for claimants with RFC specifying limited or occasional coworker contact); *Arsenault v. Astrue,* Civil No. 08–269–P–H, 2009 WL 982225, at *3 (D.Me. Apr. 12, 2009) (and cases cited therein).

Shorey v. Astrue, 1:11-CV-414-JAW, 2012 WL 3475790 at *6 (D. Me. July 13, 2012) aff'd, 1:11-CV-00414-JAW, 2012 WL 3477707 (D. Me. Aug. 14, 2012); See also Sweeney v. Colvin, 3:13-CV-02233-GBC, 2014 WL 4294507 at *17 (M.D. Pa. Aug. 28, 2014)(collecting cases). Consequently, any error in failing to assess limitations in interacting with supervisors was harmless. Rutherford v. Barnhart, 399 F.3d 546, 552-53 (3d Cir. 2005).

Plaintiff makes brief reference to the adaptation limitations identified by the physicians, including limitations in responding appropriately to changes in the work setting, understanding, remembering and carrying out detailed instructions, making judgments on simple work-related decision, and responding appropriately to work pressures in a usual work setting. (Tr. 395). However, she does not explain how these citations advance her argument and thus waives consideration of these issues. Conroy v. Leone, 316 F. App'x 140, 144 n. 5 (3d Cir. 2009) (citing Bagot v. Ashcroft, 398 F.3d 252, 256 (3d Cir.2005).

Even if she had not waived this argument, all of these limitations are also addressed by the DOT. One aspect of the DOT job descriptions is the identification of "factor[s] designated as 'Temperaments' which, in turn, consists of eleven separately-identified components." Gaspard v. Soc. Sec. Admin. Com'r, 609 F. Supp. 2d 607, 614 (E.D. Tex. 2009) (citing U.S. Dep't of Labor (1991). Revised Handbook for Analyzing Jobs. Washington, DC: Government Printing Office). Specifically:

> The 11 Temperament factors identified for use in job analysis are:
>
> D—DIRECTING, Controlling, or planning activities of others.
> R—Performing REPETITIVE or short-cycle work.
> I—INFLUENCING people in their opinions, attitudes, and judgments.
> V—Performing a VARIETY of duties.
> E—EXPRESSING personal feelings.
> A—Working ALONE or apart in physical isolation from others.
> S–Performing effectively under STRESS.
> T—Attaining precise set limits, TOLERANCES, and standards.

U—Working UNDER specific instructions.
P—Dealing with PEOPLE.
J—Making JUDGMENTS and decisions.

Gaspard v. Soc. Sec. Admin. Com'r, 609 F. Supp. 2d 607, 620 (E.D. Tex. 2009) (citing U.S.

Dep't of Labor, Revised Handbook for Analyzing Jobs 10–1 (1991)). The position of a Cleaner-

Housekeeper has only two factors: R and U. DICOT 323.687-014. The position of a press hand

has only one factor: R. DICOT 583.687-010. The position of an assembler has only two factors:

R and T. DICOT 739.687-030.

All of the jobs identified by the ALJ have a Temperament factor of "R," which is defined

as "performing a few routine and uninvolved tasks over and over again according to set

procedures, sequence, or pace with little opportunity for diversion or interruption." Gaspard v.

Soc. Sec. Admin. Com'r, 609 F. Supp. 2d 607, 615 (E.D. Tex. 2009) (citing U.S. Dep't of Labor,

Revised Handbook for Analyzing Jobs 10–2 (1991)); DICOT 323.687-014; DICOT 583.687-

010; DOT 739.687-030. None had a factor of "V—Performing a VARIETY of duties." Id. Thus,

although the ALJ failed to include any limitations in her ability to respond to changes in the

work setting, such failure was harmless, because none of the jobs identified by the ALJ involve

changes to a work setting.

Similarly, although Dr. Tardibuono indicated limitations in making judgments in the

work setting, none of the jobs identified by the ALJ had a factor of "J- Making JUDGMENTS

and decisions." DICOT 323.687-014; DICOT 583.687-010; DOT 739.687-030. Moreover,

although Dr. Tardibuono opined that Plaintiff had moderate limitations in responding

appropriately to work pressures in a usual work setting, none of the positions had a characteristic

of "S–Performing effectively under STRESS" and only one, the assembler, required a factor of

"T—Attaining precise set limits, TOLERANCES, and standards." Id. Thus, any failure to

include these adaptation limitations was harmless, because they are not required by the jobs identified by the ALJ.

Lastly, Dr. Tardibuono limited Plaintiff to simple tasks and instructions, and indicated that she would have limitations in understanding, remembering, and carrying out detailed instructions. However, another factor included in the DOT is the reasoning level. The first two positions identified by the ALJ, the housekeeper and press hand, requires only "Level 1" reasoning, which is defined as the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." DICOT 323.687-014; 583.687-010. The third position, an assembler, requires only "Level 2" reasoning, which is defined as the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." DICOT 739.687-030. As another District Court in the Third Circuit has explained:

> There is a growing consensus within this Circuit and elsewhere that "[w]orking at reasoning level 2 [does] not contradict the mandate that [a claimant's] work be simple, routine, and repetitive." *Money v. Barnhart,* 91 Fed. App'x 210 (3d Cir.2004). *See e.g. Grasty v. Astrue,* 661 F.Supp.2d 515, 523–24 (E.D.Pa.2009) (Robreno, J.) (concluding the jobs named, with reasoning levels of 2, to be "entirely appropriate," where claimant was limited to simple, repetitive tasks, but not reaching the appropriateness of level–3 jobs for claimant); *Jones v. Astrue,* 570 F.Supp.2d 708, 715–16 (E.D.Pa.2007) (Pratter, J.) (finding no "apparent inconsistency") (and cases cited), aff'd, 275 Fed. App'x 166 (3d Cir.2008). *see also Hackett,* 395 F.3d at 1176 (finding "level-two reasoning appears more consistent with Plaintiff's RFC" limiting her to "simple and routine work tasks"); *Meissl v. Barnhart,* 403 F.Supp.2d 981, 983–85 (C.D.Cal.2005) (Larson, J.) (finding no inconsistency between level 2 reasoning and claimant's RFC limiting her to "simple, repetitive mental tasks").

Simpson v. Astrue, CIV.A. 10-2874, 2011 WL 1883124 at *6 (E.D. Pa. May 17, 2011).

In sum, even if the ALJ had included limitations in interacting with supervisors, responding to stress or changes in the work setting, and understanding, remembering, and

carrying out detailed instructions, Plaintiff would still have been able to perform the positions of

a press hand and a housekeeper, which only occasionally requires interacting with supervisors,

do not require the ability to respond to changes, stress, or make judgments in the work setting,

and involve only simple, one or two step instructions. The vocational expert testified that there

were 40,000 positions as a press hand in the national economy with 310 positions in the local

region and 218,000 positions as a housekeeper in the national economy with 1,500 in the local

region. (Tr. 81).  Thus, although the Court finds that most of Plaintiff's allegations are without

merit, the Court also finds that, even if all of Plaintiff's allegations had merit, there would still

have been jobs in the national economy that Plaintiff could perform.

### D.       Failing to find that Plaintiff met or equaled a Listing

Plaintiff asserts that the ALJ should have found that she met Listing 12.04 and 12.06.

Both require that medically determinable impairments result in at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.04. The regulations define social

functioning:

> 2. *Social functioning* refers to your capacity to interact independently, appropriately,
> effectively, and on a sustained basis with other individuals. Social functioning includes
> the ability to get along with others, such as family members, friends, neighbors, grocery
> clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by,
> for example, a history of altercations, evictions, firings, fear of strangers, avoidance of
> interpersonal relationships, or social isolation. You may exhibit strength in social
> functioning by such things as your ability to initiate social contacts with others,
> communicate clearly with others, or interact and actively participate in group activities.
> We also need to consider cooperative behaviors, consideration for others, awareness of
> others' feelings, and social maturity. Social functioning in work situations may involve
> interactions with the public, responding appropriately to persons in authority (e.g.,
> supervisors), or cooperative behaviors involving coworkers.

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.00. They also define concentration, persistence, and pace:

> 3. *Concentration, persistence or pace* refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings….
> On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits.

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.00.

Plaintiff produced no objective or opinion medical evidence that would support a finding that she had a marked or extreme limitation in any area. Both state agency physicians opined that, at most, she had moderate limitations. The ALJ found that Plaintiff had moderate difficulties in social functioning because, although she has panic attacks, mood swings, and engages in self-harm behaviors, she is able to spend time with others, goes out with friends, and gets visits from friends. (Tr. 18). The ALJ found that she had mild difficulties in concentration, persistence, and pace because, although she claimed to have difficulty paying attention, finishing tasks, and handling stress, she was "noted to have no memory loss and organized thought process…having an intact recent and remote memory….[and] was able to respond to similarities at adequate levels of abstraction and complete serial 7's during a mental status examination." (Tr. 18). The ALJ later noted that Plaintiff maintained concentration during the hearing and was able to read books and watch television. (Tr. 21). Plaintiff, however, asserts that she has marked limitations in social functioning and concentration, persistence, and pace. (Pl. Brief at 12-14).

Plaintiff supports her claim that she has marked difficulties in social functioning and concentration, persistence, and pace by citing to her records from Philhaven, her December 2010 hospitalization, and her April 15, 2011 consultative exam. However, these medical records

identify the same symptoms that the ALJ acknowledged-panic attacks, mood swings, self-harm behaviors, and difficulty getting along with others-but do not contradict the ALJ's conclusion that she is able to spend time with others, go out with friends, and get visits from friends. Plaintiff's January 18, 2010 Philhaven visit indicates that she had been hospitalized five days earlier after multiple "close" friends, including her "best friend," had passed away. (Tr. 370). She also reported on January 18, 2010 that she gets social support from her boyfriend, who she had described earlier that year as "very good to her" and a "good sounding board." (Tr. 280, 370). With regard to her December 2010 inpatient hospitalization, Plaintiff had reported that no less than fifteen different friends had called and asked about her. (Tr. 316). During the April 15, 2011 consultative exam, Plaintiff "denied specific acting out or aggression towards people." (Tr. 390). Although this consultation indicated low social judgment and other social problems in the narrative, Dr. Tardibuono opined that Plaintiff was able to perform satisfactorily in all work functions involving interacting with others. (Tr. 395). The ALJ specifically cited Dr. Tardibuono's observations that she goes shopping with her boyfriend, gets visits from friends, and goes out with friends. (Tr.  19, 395). The Court also notes that in Plaintiff's June 27, 2011 Appeals Report, she indicated that she had a roommate who had moved in to help with household tasks and was able to participate in group counseling from February to June of 2012. (Tr. 40, 239). The ability to initiate social contacts and avoid social isolation indicate strength in social functioning. 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.00. Consequently, a reasonable mind could accept the relevant evidence as adequate to conclude that Plaintiff has moderate, but not marked limitations in social functioning.

Similarly, Plaintiff's Philhaven records do not support the premise that Plaintiff has marked limitations in concentration, persistence, and pace. Plaintiff notes that, on January 18,

2010, Plaintiff reported that she was sleeping only three hours per night and used energy drinks during the day, but this was almost ten months prior to the onset date and she had been off of her medications for two months at that time. (Tr. 370). Once she was prescribed the appropriate medication, she indicated to Dr. Nguyen at Philhaven that her sleep was "ok," even after a recent breakup with her boyfriend. (Tr. 380). These records also indicate that she joined a gym and was going three times per week. (Tr. 383). Similarly, she reported her sleep was "okay" at Philhaven on December 21, 2010. (Tr. 374).  although she reported feeling more tired at Philhaven on March 7, 2011, she never followed-up at Philhaven after that date. Similarly, her inpatient hospitalization supports the ALJ's conclusion. By the time of her discharge, she was "improving in her motivation [and] energy." (Tr. 314). Moreover, it was her April 15, 2011 consultative exam that the ALJ cited for the premise that her long-term and recent memory were acceptable, she could complete cognitive tasks, and she successfully completed serial 7's. (Tr. 19, 391). The regulations specifically provide that cognitive tasks and serial sevens are the preferred methods to assess concentration, persistence, and pace in mental status exams. 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.00. A reasonable mind could accept this evidence as adequate to conclude that Plaintiff's limitations in concentration, persistence, and pace were less than marked.

Even if the ALJ had erred in her Paragraph B analysis, remand would not be appropriate. The ALJ did not address the Paragraph A criteria because she found that Plaintiff did not establish the Paragraph B criteria. However, the Court notes that Plaintiff has not produced sufficient medical documentation of the Paragraph A criteria for either Listing. Plaintiff cannot establish "[m]edically documented persistence, either continuous or intermittent" for depression or anxiety, as required by Listings 12.04(A) and 12.06(A)(1), because the record does not have

any documentation of depression symptoms between March 7, 2011 and the ALJ decision date on July 23, 2012, except for Plaintiff's November 29, 2011 visit to her primary care doctor. After this visit, when her medications were restarted, she was "negative" for depression, her mood was stable, and her bipolar disorder was "well-managed." Even during her December 2010 hospitalization, she denied that her depression was constant and stated she would be depressed for a "day or two" and then she would feel "good." (Tr. 316).

Plaintiff also not produced any medical documentation that would satisfy Listing 12.06(A)(2)-(5). Plaintiff cannot establish the requirements in Listing 12.06(A)(2) or (4), because there is no evidence, medical or otherwise, of "a persistent irrational fear of a specific object, activity, or situation,"  a "compelling desire to avoid the dreaded object, activity, or situation," or "obsessions or compulsions. Plaintiff cannot establish Listing 12.06(A)(3) or (5) because, although she testified to panic attacks and nightmares from PTSD, there is no medical documentation of "[r]ecurrent severe panic attacks…occurring on the average of at least once a week" or "recurrent and intrusive recollections of a traumatic experience." Instead, the record indicates only sporadic, minimal references to panic attacks. Plaintiff reported that she had one panic attack per month on January 18, 2010, and after being prescribed Klonopin, reported no panic attacks on March 8, 2010. (Tr. 383). Plaintiff reported two panic attacks two weeks earlier on July 14, 2010 and had a  "probable" panic attack on December 28, 2010. There is no further mention of panic attacks at any time through the date of the ALJ decision on July 23, 2012. Plaintiff never mentioned flashbacks or nightmares from PTSD to any of her treating providers. Even if the ALJ had erred in evaluating the Paragraph B criteria, Plaintiff would be unable to establish the Paragraph A criteria. The Court will not remand when the outcome would be unchanged. Rutherford v. Barnhart, 399 F.3d 546, 552-53 (3d Cir. 2005).

## VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; <u>Brown</u>, 845 F.2d at 1213; <u>Johnson</u>, 529 F.3d at 200; <u>Pierce</u>, 487 U.S. at 552; <u>Hartranft</u>, 181 F.3d at 360; <u>Plummer</u>, 186 F.3d at 427; <u>Jones</u>, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. <u>Monsour Med. Ctr.</u>, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.

Dated: October 14, 2014                    _____s/Gerald B. Cohn_____
                                           GERALD B. COHN
                                           UNITED STATES MAGISTRATE JUDGE